Charles B. McELROY, Plaintiff,

v.

EMPLOYERS' LIABILITY ASSURANCE CORPORATION, Limited, Defendant.

Civ. A. No. 1418.

United States District Court

W. D. Arkansas,
Ft. Smith Division.

July 3, 1958.

Charles A. Beasley, Ft. Smith, Ark., for plaintiff.

Daily & Woods, Ft. Smith, Ark., for defendant.

JOHN E. MILLER, District Judge.

The plaintiff, Charles B. McElroy, is a citizen and resident of the State of Oklahoma. The defendant, Employers' Liability Assurance Corporation, Ltd., is a corporation incorporated under the laws of the State of Massachusetts, and is engaged in the insurance business in Arkansas.

On April 15, 1958, plaintiff filed his suit against defendant, the insurer of Sparks Memorial Hospital of Fort Smith,

Arkansas, under Ark.Stat.Ann. § 66–517 (1947), which provides:

"When liability insurance is carried by any * * * non-profit corporation, association or organization * * * or by any other organization or association of any kind or character, not subject to suit for tort, and any person * * * suffers injury or damage to person or property on account of the negligence or wrongful conduct of any such organization * * * its servants, agents or employees acting within the scope of their employment or agency, then such person * * * so injured or damaged shall have a direct cause of action against the insurance company or insurance association with which said liability insurance is carried to the extent of the amount or amounts provided for in said policy of insurance * * * and such insurer shall be liable directly to such injured person * * * for such damages to the extent of such coverage in said liability insurance policy, and the plaintiff or plaintiffs may proceed directly against said insurer regardless of the fact that the actual tort-feasor may not be sued under the laws of the State [of Arkansas.]"

Sparks Memorial Hospital of Fort Smith, Arkansas, is a charitable institution as such institutions are defined by the law of Arkansas, and is not subject to suit for tort. Michael v. St. Paul Mercury Indemnity Company, D.C.W.D. Ark., 92 F.Supp. 140, and cases cited therein.

It is admitted by the defendant that on February 12, 1957, it issued to Sparks Memorial Hospital its policy of liability insurance, and there is no question but that the insurance policy was in full force and effect on all dates material herein.

It is alleged in the complaint and admitted by defendant that plaintiff was admitted as a patient to the hospital on October 24, 1957, and that on October 30, six days later, he underwent surgery which involved an incision of his left side and the removal of a tumorous growth from his left kidney.

The plaintiff alleged that on November 7, 1957, seven days after the operation, "as a direct and proximate result of the carelessness and negligence of said hospital and its servants, agents and employees, the said incision burst open and the plaintiff suffered damages"; that the injuries and damages to plaintiff were proximately caused by the negligence of the hospital, its agents, servants and employees, by moving the plaintiff in a careless and negligent manner without using due care to protect said incision; that the said agents and employees, without using due care, held the plaintiff about the body in a careless and negligent manner and, when placing the plaintiff in a wheel chair, carelessly and negligently pulled on his body in such a way as to cause said incision to burst open; that the hospital negligently failed to provide personnel trained and equipped to move and handle a person in the plaintiff's condition, and that only nurses aids were provided for such work and service.

The plaintiff further alleged that as a result of the negligence of the hospital, its servants and employees, the plaintiff suffered a permanent partial disability, severe and excruciating pain and suffering from said injuries, incurred additional hospital, ambulance and medical expenses and lost earnings and will continue to lose future earnings, all as a direct result of the alleged negligent acts.

On June 30, 1958, the case was tried to the Court, without the intervention of a jury.

Testimony in reference to the alleged negligent acts establishes that at the time of the plaintiff's admission to the hospital he was sixty-nine years of age, having been born January 7, 1888. He had been referred to the hospital by a Dr. Lowery of Poteau, Oklahoma, and was at that time a severe arthritic and had been since 1950 or 1951. However, he had lost no time from his partial employment as a pharmacist prior to October 7, 1957, although he was then and had for some-

time been confined to a wheel chair and had suffered a partial paralysis of both lower extremities and early paralysis of his upper extremities. There was a marked deformity of the upper and lower extremities, particularly of the fingers, due to arthritis, and there was some contracture of both knees and both elbows. Prior to the date of the operation, he had been referred to the Internal Medicine Department of the Holt-Krock Clinic of which Drs. Wilson and Wilson are members, and was cleared for the surgery by the Medical Department. The operation (left nephrectomy) was performed October 30, 1957, under a general endotracheal anesthesia. After removal of the twelfth rib, he was found to have a large tumor on the upper pole of his left kidney which was adherent to surrounding structures. A post examination on October 31, 1957, disclosed that the general condition of the plaintiff following the operation was good, and his attending physician prescribed that he should be given daily exercise by removing him from his bed to a wheel chair. He was also provided with a bed bicycle for exercise of his extremities. On November 7 about 8 o'clock a. m., the superficial sutures were removed by his attending physician, but the chromic sutures were not removed. The hospital record introduced into evidence erroneously reflects that the superficial sutures were removed on November 6, 1957.

A record made by Mrs. Helen Moser, Registered Nurse, reflects that in the afternoon of November 7, 1957, the plaintiff asked for help to get up out of bed, and that Miss Gayle Price, now Mrs. Gayle Price Durham, a student nurse, and Miss Clara Reicker, a nurses aid, went to help him, and according to his directions they got him out of bed and into the wheel chair with some assistance from him. While in the process, the plaintiff stated he felt "as if something broke loose". He was lifted back to bed by Mrs. Gayle Price Durham and Mrs. Moser, R. N., and the doctor notified.

As a matter of fact, the nurses aid and the student nurse went to his room on the morning of November 7, shortly after the superficial sutures had been removed, and proceeded to remove the plaintiff from bed into the wheel chair. Miss Reicker, the nurses aid, placed her arms around his lower back while Miss Price, the student nurse, held the chair in place. The plaintiff protested the manner of such removal and was rather vocal in his protestations against the procedure. Upon placing him in the chair the nurses aid permitted her hands and arms to move upward from the lower back or hips and one of her arms passed over the incision. Suddenly the plaintiff advised the young ladies that the wound had opened, and the registered nurse in charge on the floor, Mrs. Moser, was called. Upon examination of the wound it was found that the upper one-half of the incision had opened down to the peritoneum and that the muscles and lumbo-dorsal fascia were gaping widely.

The testimony of the nurses aid and the student nurse was contrary to the testimony of the plaintiff as to the procedure used in removing him from the bed to the wheel chair, but the Court is of the opinion that the plaintiff's version of what occurred is correct. The testimony of the young ladies as to the procedure employed by them was not convincing. In fact, they had very little definite remembrance of what was done or how it was done. They had been instructed how to remove a disabled patient from a bed to a wheel chair, and the student nurse demonstrated to the Court the proper procedure, but in this case they did not follow the procedure which they had been taught.

The attending physician's notes, dated November 7, 1957, state:

"Patient's wound gaping for half of its length. After removal of sutures yesterday (the sutures were removed on November 7 and not November 6), patient moved suddenly in bed and felt it give way."

This statement of the attending physician to the effect that the patient moved suddenly in bed and felt the wound open is diametrically opposed to the record

compiled by Mrs. Helen Moser, R. N., hereinbefore referred to in which she states that, during the procedure of removing the plaintiff from the bed to the wheel chair, he felt "as if something broke loose."

The physician further reported on November 10:

"Wound dressed. One-half of wound is completely healed, the other half is gaping as described previously. Patient's poor wound healing due to the fact that he was taking cortisone for long periods of time in spite of the fact that he was given acthar pre-operatively."

On November 22 the physician's record shows:

"Patient's wound is healing well but slowly. It has been clean since the original sutures were taken out. Patient's wound is dressed every few days and approximated with butterfly flamed adhesive."

On November 25 the physician in his record stated:

"Status quo. Wound healing in from below gradually."

The acthar that the physician refers to in his notes of November 10 was administered to stimulate the adrenal glands and to counteract the effects of cortisone.

The Court is convinced that the servants and employees of the hospital in removing the plaintiff from the bed to the wheel chair on November 7 did not give him reasonable care and attention under the conditions that existed. The hospital was fully advised of the necessities of his case and in the exercise of ordinary skill in giving the plaintiff the care and attention that his condition required, the nurses aid and the student nurse did not follow the procedures which they both testified had been taught them. Mrs. Gayle Price Durham, the student nurse, during the trial demonstrated with the attorney for the defendant the procedure which she and other students were taught and, of course, she testified that they followed that procedure. The registered nurse in charge on the floor knew, as did the Superindendent and other responsible employees of the hospital, the condition of the plaintiff, but notwithstanding that knowledge on their part they directed that he be removed from the bed to the wheel chair by a nurses aid who had only been employed at the hospital since October 20, 1957, or a period of eighteen days.

The Court is convinced that as a result of the visceration of the wound the plaintiff suffered additional physical pain and mental anguish; that he was confined to the hospital an additional period of time and suffered a financial loss in his employment as a part-time pharmacist.

The remaining question is whether the negligent acts of the hospital as above set forth were a proximate cause of the injuries and damages suffered by plaintiff. The record does not disclose that the hospital knew or should have known prior to the operation that plaintiff was suffering from any incurable disease, but the operation disclosed that his physical condition was such that the healing of the incision probably would be retarded because of the physical condition of the plaintiff and the effects of the cortisone that he had been taking intermittently prior to his admission to the hospital.

Plaintiff had suffered no ill effects prior to November 7 by his removal daily from the bed to the wheel chair or by the use of the bed bicycle. His physician testified that it was advisable that he be given all of the exercise possible to prevent congestion of the lungs or other complications. He would have been discharged from the hospital in a week or two weeks from November 7 if the incision had not burst open.

The attending physician's notes state: "10–31–57 First postoperative day. Postanesthetic note: Heart and lungs normal. Abdomen soft. Dressings only slightly bloodstained. Temperature flat. General condition good.
"11–3–57 Patient running a very smooth postoperative course. He is

out of bed daily. He has had no fever since surgery. Dressings remain dry.

"11–6–57 Patient continues to do well postoperatively. * * *"

Because of the opening of the incision, he was not discharged from the hospital until December 9, 1957, when he returned to his home at Talihina, Oklahoma, and his wife attended him and dressed the wound daily until February 5, 1958. On or about February 5, 1958, he returned in a wheel chair to his part-time employment as a pharmacist, and had been working intermittently from that time to the date of trial as a pharmacist, and was drawing a salary of $100 per month. In his work he used the wheel chair as a method of locomotion.

Three physicians, Dr. Sumter Wright Hawkins, a general surgeon, and Drs. Morton Wilson and Carl Wilson, urologists, all called by defendant, testified that in their opinion the wound did not open by reason of the manner in which the plaintiff was removed from the bed to the wheel chair. Naturally, the physicians were basing their opinion upon the assumption that the nurses aid and student nurse followed the correct procedures in handling the plaintiff. All of the physicians were of the opinion that the wound opened because of the effect of the cortisone previously taken by the plaintiff, and that the arthritis was a contributing factor. The physicians said that it is possible to cause a surgical wound to viscerate or open by outside pressure but that most viscerations are caused by internal pressure or by the inherent weakness of the sutured muscles. They also based their opinion upon the fact that the lower half of the incision did not open and that the visceration occurred in the muscles of the upper half of the incision. The muscles in the lower half were thinner and more fibroid, and, because of the structure of the lower muscles, the chromic sutures held.

Dr. Hawkins also testified that in his opinion the examination of the wound before removal of the superficial sutures would have indicated that the muscular tissues in the upper half of the incision were not healing inwardly. However, Dr. Morton Wilson testified that his examination at the time the superficial sutures were removed did not reveal lack of inward healing.

In Durfee v. Dorr, 123 Ark. 542, at page 547, 186 S.W. 62, at page 63, the court said:

"The principle of law which controls is one which has been applied to many situations. The keeper of the hospital is liable for damages if he fails to perform some duty which he owes to the patient, and the patient is injured as a result of this failure. The extent and character of this duty depends on the circumstances of each particular case. A jury would be warranted in assuming that a patient will need some care and attention from the very fact that he placed himself, or is placed, in the institution, and as appellees were in sole charge of this sanitarium, and Durfee was their patient, it was their duty to give him reasonable care and attention and to have that knowledge of the necessities of his case which would result from this care and attention and from the possession of ordinary skill in his treatment, there being no representation here on appellees' part of extraordinary skill. Appellant had not contracted for the services of a special or individual nurse, but that fact did not absolve appellees from the discharge of their duty to Durfee."

On a subsequent appeal of the same case, 131 Ark. 369, 199 S.W. 376, the court held that the testimony of practicing physicians who qualified as experts is admissible to establish the character of the attention a patient should receive in a hospital, and that the average juror would have no information or experience upon which he would be in a position to formulate an intelligent conclusion unless he based his conclusion upon the opinion of one qualified to speak as an expert. The Court is not expert on procedures

that should be employed in the care of patients in a hospital, and entertains high regard for the physicians who testified in the case. However, the Court is convinced that their opinion as to the cause of the visceration of the incision is based upon the hospital records and the assumption that the nurses aid and student nurse followed the procedure which is taught in nursing schools as the correct procedure in handling disabled persons, but the Court has found that the correct procedure was not followed and that the hospital failed in the performance of its duty to give plaintiff the reasonable care and attention the known facts required it to give.

The law seems to be settled and all the authorities hold that hospitals owe to their patients such ordinary care and attention as the mental and physical condition of such patients reasonably require. The law demands reasonable care, such care as a reasonable man would take under the circumstances existing, but a hospital is not required to take measures against a danger which the circumstances as known to it would not suggest as likely to happen.

The great weight of authority also establishes the principle that nurses in the discharge of their duties must obey and diligently execute the orders of the physician or surgeon in charge of the patient, unless, of course, such order was so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result to the patient from the execution of such order or the performance of such direction. The law contemplates that the physician is solely responsible for the diagnosis and treatment of the patient. Nurses are not supposed to be experts in the technique of diagnosis or the mechanics of treatment. See Byrd v. Marion General Hospital, 202 N.C. 332, 162 S.E. 738.

The orders given by the attending physicians and transmitted by the hospital to the nurses aid and the student nurse required the removal at least daily of the plaintiff from the bed to a wheel chair. Those orders were in effect on November 7 following the removal of the superficial sutures, and the Court has found that the removal procedures used by the nurses aid and the student nurse were not in accordance with the approved methods. The fact that the incision viscerated or opened does not establish negligence in view of the ailments from which the plaintiff was suffering at the time. But the Court is convinced that the injuries suffered and the damages sustained by plaintiff were proximately caused by the negligent acts of the nurses aid and the student nurse and that the hospital and those in charge of it did not give the plaintiff the reasonable care and attention that their knowledge of the necessities of his case demanded. The fact that the plaintiff had not contracted for the services of a special or individual nurse did not absolve the hospital from the discharge of its duty to the plaintiff.

The proof does not show the amount that plaintiff owes or contracted to pay to his physicians for their services, but it does show that the total hospital bill was $985.45, of which amount $337.-35 was paid by his insurer, and, after crediting that amount and certain other small sums, the plaintiff owes the hospital the sum of $648.10 of which $352.35 is directly attributable to his extended stay in the hospital. Had the negligent acts not occurred, he would have been discharged not later than November 20, 1957, instead of December 9, 1957, and thus he sustained some loss of earnings as a result of the negligence of the nurses. He suffered excruciating pain as a result of the negligent acts for which the Court feels that he should recover. The Court is convinced that a total award for all damages, including pain and suffering, loss of earnings, medical and hospital expenses, of $4,000 is reasonable under the circumstances.

Therefore, a judgment in favor of plaintiff for the recovery of $4,000 and costs is being entered today.