## Louis A. DOLLINS et al v. HARTFORD ACCIDENT & INDEMNITY CO.

5-5796 477 S.W. 2d 179

Opinion delivered March 6, 1972

14

*Whetstone & Whetstone,* for appellants.

*Smith, Williams, Friday, Eldredge & Clark;* By: *W. A. Eldredge, Jr.* and *J. D. Watson,* for appellee.

JOHN A. FOGLEMAN, Justice. Appellant contends that the circuit court erred in directing a verdict against him in his suit, individually and as administrator of his wife's estate, against the appellee as liability insurance carrier for St. Vincent's Infirmary in Little Rock. Appellant's complaint sought recovery for damages sustained by appellant's wife, Bertie Evelyn Dollins, as the result of a fall while she was a patient in the hospital. Mrs. Dollins was originally a plaintiff in the action, but she died before the trial from causes unrelated to her fall.

On August 13, 1970, Mrs. Dollins suffered a stroke. She was taken to St. Vincent's Infirmary for treatment, where she was kept in the intensive care unit for 14 days. On August 27, 1970, she was placed in a semiprivate room. Medication was being given her for the prevention and control of seizures and the four side rails on her bed were raised. No rails or other restraints were provided across the foot of the bed. On August 28, at 11:00 p.m., Mrs. Sandra DeLeuil, a registered nurse employed by the hospital, came on duty as the nurse in charge of the unit in which Mrs. Dollins was a patient. After a routine check of Mrs. Dollins' room at 2:00 a.m. on August 29, this nurse noted on the patient's chart: "Awake for medication. Appears confused. All four side rails up." The nurse gave the patient the anti-convulsant medication which had been prescribed and left the room. At 3:35 a.m. Mrs. Dollins was found on the floor at the foot of her bed, with blood on her face, hands and gown and cuts about her face. Among her injuries were cuts in her gums from her dentures which had not been removed

from her mouth. The dentures were broken in the fall.

This nurse knew that the patient had undergone seizures and that she had been restrained during the period she was confined in the intensive care unit. For the purpose of making chart entries, the nurse used three classifications for patients whom she found confused. They were: confused, slightly confused and very confused. She described the stage noted as "confused" to be a degree more than slightly confused and different from "disoriented." She did not have an independent recollection whether the patient was disoriented, but relied entirely upon the chart notation she made. To have used the word "disoriented" would have meant to her that the patient did not know who she was, where she was or what was going on about her.

The patient's physician had not ordered any restraints on her except for the four side rails which were raised. The matter of other restraints at the time rested in the discretion of the nurse in charge. She did not have to have the permission of a doctor before using a safety belt on a patient. Mrs. DeLeuil had on some occasions applied belts or other such restraints on patients. One of the devices she had used and which was available in the hospital was a posey belt. This was described by her as a strap which goes around a patient's waist to be fastened under the bed or to its sides in a manner which permits the patient to turn from side to side, but prevents him from getting out of the bed. The belt can be applied in five minutes. It was the nurse's opinion that when she observed the patient at 2:00 a.m. there was no need for the use of such a belt, but one was applied by direction of the attending intern after the patient's facial wounds had been treated.

Mrs. DeLeuil was the first person to reach Mrs. Dollins after the fall. The patient told the nurse that she was going to the bathroom when she fell. According to the nurse, the use of four side rails was a normal precaution for a patient who was subject to seizures. The room was equipped with a call light by which the nurse

could be summoned. The nurse did not recall having received any call from the patient on the night in question. Mrs. DeLeuil knew that Mrs. Dollins was physically able to get out of bed. In this nurse's judgment, based upon her experience, additional restraints are not necessary for a "confused" patient, unless he had previously been trying to get out of bed or there were other factors indicating the likelihood of some unusual hazard to the patient's safety. She considered that restraints tended to disturb a patient so that he could not get needed rest. Mrs. DeLeuil said that in four years' experience in the capacity in which she was acting on the night of Mrs. Dollins' injury, she had never had a patient subject to seizures who had not been successfully prevented by the side rails from falling out of bed. She testified that in the case of most seizures there would be a jerking movement or thrashing around of the patient's body, but that she had never seen such an active seizure that a patient could get up and jump out of bed. In her opinion, there was no need for restraints on Mrs. Dollins other than the four bed rails.

Dr. Henry Johnson had admitted Mrs. Dollins to the hospital because of his diagnosis of possible stroke. He testified that she had seizures on admission. He did not remember whether she had undergone others while in intensive care. Her removal to the semiprivate room was an exercise of his discretion. In his opinion, restraints other than the bed rails were not indicated prior to Mrs. Dollins' fall. He testified that restraints are ordered when a patient is extremely agitated or combative, and he felt that restraints often increased a patient's agitation. Although Dr. Johnson described the patient as being somewhat confused throughout her hospital stay and recalled no dramatic change, he felt that she was continuously improving mentally after she was released from intensive care.

Appellant contends that he had met his burden of proof under the doctrine of res ipsa loquitur, if not otherwise, making the directed verdict erroneous. He argues that the patient, the safety restraints and the nurse were all instrumentalities under the control of the hos-

pital. He relies upon our decision in *Martin* v. *Aetna Casualty & Surety Co.*, 239 Ark. 95, 387 S. W. 2d 334, where we said that when a patient was injured as a result of the collapse of a leg rest on a wheel chair furnished by a hospital, the doctrine applied as a rule of evidence. We do not agree that the rule applies in this case, however. We stated the conditions under which res ipsa loquitur comes into play in *Southwestern Bell Tel. & Tel.* v. *Bruce*, 89 Ark. 581, 117 S. W. 564, and followed that formula in *Martin* and other cases. We require, in addition to the duty of the defendant to plaintiff, to use due care, that (1) the injury be caused by an instrumentality under the control of the defendant, (2) the accident which caused the injury be one that, in the ordinary course of things, would not occur if those having control and management of the instrumentality use proper care and (3) there be absence of evidence to the contrary. We are unable to say from the evidence adduced that the accident that befell Mrs. Dollins was one that, in the ordinary course of things, would not have occurred if those having control and management had used proper care. Dean Prosser teaches that before res ipsa loquitur can be applied, there must first be an inference that someone must have been negligent and then the burden of proof is upon the plaintiff to show that the negligence was that of the defendant and to trace the injury to a cause or specific instrumentality for which the defendant was responsible or show that he was responsible for all reasonably probable causes. He also says that there must be an absence of any action on the part of the injured party contributing to the accident, and that the doctrine will not apply until the plaintiff has satisfactorily accounted for the conduct of the injured party. Prosser, Law of Torts, Fourth Edition (1971), pp. 214-225.

It is, of course, common knowledge that many falls occur when there is no negligence or fault on the part of anyone. Furthermore, it does not seem to us that a patient who could tell the nurse what she was doing and where she was going was in such a mental state that her efforts to go over the foot of the bed in order to go to the bathroom were involuntary, or that she became so completely under the control of hospital personnel as to

make her an "instrumentality" under the hospital's exclusive control contributing to her own injury, or make the hospital responsible for all reasonably probable causes of the injury. Her state of confusion, as designated by the nurse, did not sufficiently explain the patient's own conduct contributing to the injury. In addition, it is important to remember that the doctrine of res ipsa loquitur is founded upon the availability of evidence of the true cause to a defendant but not to the plaintiff. *Sauter* v. *Atchinson*, 250 Ark. 697 (1971), 466 S.W. 2d 475. While this foundation is not the ultimate test of the doctrine's application, nevertheless we cannot say that the evidence of the cause of Mrs. Dollins' fall was not fully available to her or to her husband. Her death did not bring the doctrine into play.

Fundamental to the application of the doctrine is the necessity that there must have been an inference of negligence on the part of the defendant as a proximate cause of the injury. Appellee certainly owed a duty to Mrs. Dollins. It was best defined in *Durfee* v. *Dorr*, 123 Ark. 542, 186 S. W. 62. It was the duty of the hospital to give her reasonable care and attention and to have that knowledge of the necessities of her case which would result from such care and attention and from the possession of ordinary skill in her treatment. In other words, it was the duty of the hospital to see that the patient had such attention as her condition apparently made necessary. St. Vincent's Infirmary was bound only to the degree of care proportionate to the danger to be apprehended, judged by the condition of affairs before the accident occurred.

When we apply this standard to the facts in this case, it is clear to us that the directed verdict was properly granted, because of appellant's failure to show that there was negligence, or an inference of negligence, on the part of the hospital. Foreseeability is an essential ingredient of negligence, as recognized in *Durfee*. Conduct becomes negligent only as it gives rise to appreciable risk of injury to others, and there is no negligence in not guarding against a danger which there is no reason to anticipate. *North Little Rock Transportation Co.* v. *Finkbeiner*, 243 Ark. 596, 420 S. W. 2d 874.

The evidence presented by appellant was not sufficient to show that there was any reason for the nurse or any of the hospital personnel to anticipate that Mrs. Dollins would, either in the throes of a seizure, or in an effort to go to the bathroom, fall from the foot of her bed. There was no evidence showing any reason to even anticipate that she would make an effort to get out of the bed in spite of the side rails.

This test of foreseeability has been recognized and applied in a like manner in similar actions against hospitals in other jurisdictions. See *Davis* v. *Springfield Hospital,* 204 Mo. App. 626, 218 S. W. 696 (1926); *Breeze* v. *St. Louis, S. F. Ry. Co.,* 264 Mo. 258, 174 S. W. 409 (1915); *Spivey* v. *St. Thomas Hospital,* 31 Tenn. App. 12, 211 S. W. 2d 450 (1947), cert. denied by Tennessee Supreme Court, March 5, 1948, reh. denied, May 3, 1948; *McElroy* v. *Employers' Liability Assurance Corp.,* 163 F. Supp. 193 (D. C. Ark. 1958).

This case is distinguishable from *Durfee* in that the injured patient there found outdoors on the ground just below an upstairs hall door was known to have been very desperately ill, the building was in darkness, all hospital doors were unlocked, the patients could go about as they pleased and the jury was justified in believing that the attending nurse had been asleep. There was no evidence to warrant an inference of negligence here.

Appellant also argues that the hospital owed the patient that degree of care which would have prevented the fall. This would not only improperly make the test for negligence restrospective, but would make the hospital an insurer of the patient's safety, inconsistent with our holding in *Durfee* and contrary to well established and widely recognized legal principles. See 40 Am. Jur. 2d 869, Hospitals, § 27; 41 C. J. S. 350, Hospitals, § 8c(3).

We affirm the judgment of the circuit court.