Herman DYE et ux *v.* Fred R. BURDICK et ux

77-6                                        553 S.W. 2d 833

Opinion delivered July 18, 1977
(In Banc)

*Howard L. Slinkard,* for appellants.

*Little, Lawrence, McCollum & Mixon,* by: *Sidney H. McCollum,* for appellees.

JOHN A. FOGLEMAN, Justice. This is an appeal from a judgment on a verdict directed against appellants Herman Dye and his wife, whose home was destroyed by flooding which resulted from the bursting of a dam on property owned by appellees. We agree with appellants that a verdict should not have been directed upon the conclusion of the evidence on behalf of the appellant-plaintiffs.

Sometime in the 1960's, Clifford Mills contracted with a contractor to build a stock pond or small lake on a farm he owned in Benton County, by building an earthen dam across a narrow hollow or ravine which constituted a drain or waterway. The dam was 29 to 30 feet high, over 350 feet long and capable of containing five to six acres of water. It lay across the narrowest part of the ravine. The drain plain was between 92 and 95 acres. A spillway cut by a bulldozer was 10 to 12 feet wide at the bottom. Appellants' dwelling house was located one-fourth to one-half mile below the dam.

In 1970, Burdick purchased the Mills property and moved into a dwelling on the property in 1973. Between June 6 and June 9, 1974, there was rainfall in excess of nine inches. There was considerable flooding in the area on June 8 and 9, with creeks overflowing their banks. Several bridges and roads were washed out and Benton County was declared a disaster area. The dam on the Burdick property broke during the early morning hours of June 9. The water followed the course of the ravine and inundated appellants' home, where they had lived for 19 years. Appellants were awakened about 3 a.m., went downstairs and found water deep enough to reach the armpits of their son, who had been sleeping on a divan downstairs. They fled upstairs. Dye said it took the water 20 or 30 minutes to recede.

Appellants brought this action against appellees in June, 1975, to recover damages for their loss as a result of the flooding. They alleged that the dam was improperly and inadequately constructed and that during the heavy rainfall on June 8 and 9, the reservoir filled and, since the spillway failed to drain off the excess water, it overtopped the dam and caused it to burst; and, as a result, their house, furniture, appliances, farm equipment, automobiles, crops, fences and other improvements were destroyed.

Appellants also alleged that appellees were negligent in that they knew or should have known that the spillway was improperly built and inadequate for the purpose intended, but failed to correct the defects or to maintain and operate the dam in a careful and prudent manner to avoid contingencies expected to occur.

Appellants later filed an amendment to their complaint. In it they alleged that appellees' maintenance of the dam and reservoir, as it existed and had been constructed and maintained, created an inherently dangerous hazard which resulted in interference with the use and enjoyment of their land; that the abnormally dangerous activity consisted of the construction and maintenance of the dam in a deep ravine in a runoff area and not in a creek bed; that it was constructed and maintained as a stock pond but was actually a lake; that it was built with knowledge that appellants' home was

located at the bottom of the ravine; that due to the dimensions of the dam and its other characteristics, appellees knew, or should have known that any failure of the dam would result in serious damage to appellants' property; and that the size, location and situation of the dam were a threat to appellants and a hindrance to the use and enjoyment of their property.

The rain had stopped when Herman Dye came home on the night of June 8 at 10:30 or 11:00 p.m. and Sugar Creek, north of the Dye house, had crested and was falling. He had seen this creek when it was larger. He said that other creeks had been falling during the afternoon. Dye said that, during the spring of 1974, after the record rainfall in November, 1973, he had gone to Burdick's place to check on a sick heifer, and while he and Fred Burdick were standing between the Burdick house and the dam, Burdick had said that he couldn't help but worry about people living below the dam, but that, if it ever was to break, he didn't think there was any danger. Dye said that Burdick said that, in 1973, the lake had risen higher than ever before.

Dye testified that, after construction of the dam, there had been a hole in the dam, and that an effort to repair it had failed. As a result, water would leak through at higher water levels. Dye had never known water to go over the spillway.

Mrs. Dye went along with her husband on the visit to the Burdick place. She related that Burdick had said that he had been really concerned about the Dyes in the preceding November and had stood on his sun deck and watched the water lap up against the dam. He said that thereafter he did not believe the dam was going to break.

There was no evidence that water had earlier risen more than three-fourths the height of the dam. There was no evidence that appellees had done anything to the dam or lake, except to use the lake as a stock pond in connection with their farming operation.

Edward C. Grubbs, a consulting engineer, who specializes in soil mechanics and foundation engineering,

who had worked with the Missouri conservation system in designing dams and had designed numerous dams in Arkansas, inspected the dam to determine the cause of its failure. Upon inspection of the earthen embankment, two-thirds of which remained intact, the cause of the failure was not apparent, but when he observed the size of the spillway he walked upstream and looked back at it and it appeared to him that the bottom of the spillway was not as low as the top of the dam. Upon measurement with surveying equipment he found that the part of the dam remaining was only eight inches higher than the spillway, and that the missing middle portion would have been not more than six inches higher than the spillway. He said that if only six inches of water started flowing over the spillway, water would begin going over the top of the dam. According to him, at a minimum, a properly designed spillway would have been 50 feet wide with a bottom five feet lower than the top of the dam. Such a spillway would have allowed water to flow two and one-half feet deep for a fifty-year flood (a flood that is possible on the average once every fifty years in a thousand years). He said that the factor of safety, i.e., the ratio of the "chances for failure on the chances for success," for a lake 30 feet deep and containing five to six acres of water should be two and one-half. With a factor of safety of one, the dam would have been on the verge of failure, in his opinion. Grubbs said that it was obvious that the factor of safety of this dam on the day before its failure was less than one. He expressed the opinion that the spillway was not acceptable and was completely inadequate to carry the water. He felt that the middle section of the dam was some lower than the outer portions, and said that a dam which is level when built will develop a sag.

Grubbs also said that the dam was not properly constructed, because the proper procedure of putting in dirt in six to eight-inch layers followed by rolling each layer with a sheepsfoot roller had not been followed. He expressed the opinion that on June 8, 1974, the dam was "absolutely abnormally dangerous." Grubbs said that the rainfall of seven inches in three days at that time was less than the fifty-year flood rainfall, which he said would be produced by a rainfall over the watershed of seven inches in 24 hours. Grubbs testified that the runoff was greater when the ground was

saturated than when it was dry. He could see no reason for the breach of the dam other than by overtopping. Grubbs found trees growing on the embankment and in the spillway. Trees and growth in the spillway made it obvious to him that the dam had not been properly maintained.

Grubbs compared the November, 1973 rainfall with that in June, 1974 from U.S. Weather Bureau records and found that more rain fell in two days in November than during the three-day period in June, but said that there had been no rain for the two days preceding the heavy two-day rain in November. There had been rain for several days prior to the heavy June rain, and this, according to Grubbs, had a definite effect on the lake filling and overtopping the dam. In Grubbs's opinion, the dam did not fail in November, 1973, because the leak or crevice in the side of the embankment would then let water flow out; but it was possible that the hole had subsequently been plugged with brush, leaves or other sediment.

Dane Galyean, a farmer who had lived nearby for eight years, testified that he was at Burdick's place in August after the dam broke. He said that he asked Burdick if water had run through the spillway and that Burdick had said, "No." He said that it was discussed that one could see where water had gone over the center of the dam. He had noticed the dam two or three times previously and it appeared to him that the spillway was higher than the center of the "dike." Galyean had mentioned this to the previous owner, but never to Burdick.

Appellants list four points for reversal. Essentially they are based upon the contention that the evidence on behalf of appellants made a prima facie case for submission of the question of appellees' liability for the damages suffered by appellants on the basis of negligence, on the doctrine of res ipsa loquitur and on the theory of strict liability. We agree that there was sufficient evidence to submit the case on the question of negligence, both on direct evidence and res ipsa loquitur, but find no basis for strict liability.

In a case quite dissimilar on the facts, we recognized the

basic general rule involved here. In *Anderson Hotels of La., Inc.* v. *Seibert,* 213 Ark. 624, 211 S.W. 2d 876, we quoted that principle from 2 C.J.S., Adjoining Landowners, § 44, Footnote 82, viz:

> "One who collects and keeps water on his premises, which is likely to do mischief if not properly controlled, is liable for his negligence, either in the original construction of his reservoir or receptacle, in subsequently allowing it to become defective, or in failing properly to guard against all such contingent damages as might reasonably be anticipated."

The fact that appellees did not build the dam but bought the land several years after it was built does not insulate them from liability arising from defective construction or inadequate design. The general rule, or at least what we take to be the better rule, is properly stated by the textwriter in § 218, Waters, 78 Am. Jur. 2d 665, viz:

> As a general rule, the person who is in possession and control of a dam or reservoir at the time it gives way is the one responsible for the injuries caused thereby. Thus, the grantee of a dam which was negligently constructed in the first instance is liable for injuries caused by its giving way, although he has received no express notice of the defective condition of the dam.* * *

This rule does not mean that the grantee or vendee becomes absolutely for harm or damage from an existing condition upon acquiring land upon which such a structure is located. The limitations upon application of the general rule are stated in Restatement of the Law, 2d, Torts 2d, § 366. The text of this section and some of the comments are particularly appropriate in this case, to wit:

> One who takes possession of land upon which there is an existing structure or other artificial condition unreasonably dangerous to persons or property outside of the land is subject to liability for physical harm caused to them by the condition after, but only after,

(a) the possessor knows or should know of the condition, and

(b) he knows or should know that it exists without the consent of those affected by it, and

(c) he has failed, after a reasonable opportunity, to make it safe or otherwise to protect such persons against it.

Comment on Clause (a):

c. * * *

It is not, however, necessary to the liability of one who takes possession that he in fact discover the dangerous condition. It is enough that he should know of it. "Should know" is defined in § 12 as meaning that a person of reasonable prudence and intelligence, or of the superior intelligence of the actor, would ascertain the fact in question in the performance of his duty to another, or would govern his conduct on the assumption that such fact exists. Where possession is acquired voluntarily, as by purchase, lease, or the acceptance of a gift, the person taking possession is required to make reasonable inspection and inquiry as to the condition of the land. As to any defects, disrepair, or other dangers which are patent and obvious, he therefore should know of their existence at the time he takes possession. Even as to latent defects, the vendee or lessee may have enough in the way of information or warning to lead a reasonable man to investigate, so that he "should know." Where he has no such information or warning at the time he takes possession, his long continued occupation and use of the land may in itself justify the conclusion that he should have discovered the danger. For example, a possessor who has used the land for years may reasonably be presumed to know every condition or danger upon it, or to have failed to exercise reasonable care to investigate and discover it.

*d.* In determining whether the possessor should know of a particular defect or danger, the location and condition of the land, the nature of the use or occupation, and the character of the condition or danger, all are to be taken into account. A casual inspection which might be sufficient where a structure is in a lonely district may be unreasonably inadequate if it abuts upon a much traveled highway in a city. \* \* \* A concealed condition which is not readily discoverable in the course of the vendee's use of the land will permit a longer period of time before the possessor should know of it than one which is obvious, or which should normally be discovered in a short time.

Comment on Clause (b):

*e.* As to some defects, disrepair, or other dangers the vendee or lessee may reasonably assume, in the first instance, the consent of those affected by them. This is true in the case of many private nuisances. Thus the purchaser of land on which there is an old dam which, after every heavy rainfall, backs up the water of a stream so that it overlows the land of others, may reasonably assume that the condition exists with the consent of all those so damaged, and that if their rights have been invaded the grantor or some predecessor has made due compensation, or otherwise obtained their consent. In such a case some notice, complaint, or request to abate the condition may be required before the possessor should know that there is no such consent.

*f.* On the other hand, there are many conditions, even of private nuisance, as to which such an assumption cannot reasonably be made. \* \* \*

This is true in particular in two types of cases. One is where the condition is imminently dangerous, and threatens serious bodily harm to persons outside of the land. Consent to the existence of

> such a condition and its danger cannot reasonably
> be assumed, in the absence of some information in-
> dicating that it has in fact been given. * * *

The general principles stated in the texts above have been applied by the courts and, even though the authorities are not unanimous on the subject, there is respectable and well-reasoned authority supporting these general rules, as applied to situations similar to the one at hand. In *Town of Monroe* v. *Connecticut River Lumber Co.,* 68 N.H. 89, 39 A. 1019 (1894), it was held that a purchaser of an unsafe dam, who fails to make it safe, and to so maintain it as not unnecessarily to endanger life or property, is liable for injuries caused thereby. In that case the jury was instructed that the purchaser was "not liable for maintaining the dam in the condition in which it was when they bought it, unless they knew, or by the exercise of ordinary care would have learned, that it might be subjected, by freshets and otherwise to the strain brought to bear upon it at the time it gave way, and was insufficient to stand such strain, and that the [purchaser was]not liable unless, but for their negligence, the washout would not have occurred." This pertinent paragraph of the opinion is appropriate here:

> The defendants' offer to show that after they bought the mill and the dam, in 1886, they never receiv-ed any notice from the selectmen or other officers of Monroe, or from any source, that the dam was unsafe and insufficient, was properly excluded. No such notice was necessary. Whatever may have been the condition of the dam before its purchase by the defendants, they then became bound to keep it in a reasonably safe condi-tion. As its owner and occupant, it was a duty cast upon the defendants by the law to so use and maintain the dam as not unnecessarily to endanger the safety or property of others; and if they neglected this duty, the law renders them liable for the consequences.

It would be difficult to imagine a case more nearly parallel to this than *Richland County* v. *Anderson,* 129 Mont. 559, 291 P. 2d 267 (1955), where the principal question was sufficiency of the evidence to support a verdict against the

grantee of the owner who caused the dam in question to be constructed. The court found that the evidence was sufficient to show that the dam was not reasonably safe for the storage of water impounded by it, that when the grantee took possession of the dam and reservoirs she would have known of the dangerous condition and the risk of a break and injury to others if she had had a reasonable inspection made by one skilled in such matters and that, because of her failure to have such an inspection made and to acquaint herself with the danger inherent in the dam reservoir after she came in possession and control, she was guilty of negligence; or, in other words, that in the exercise of ordinary care, she would have known that the dam and its spillway were negligently constructed and would not have used the dam and reservoir until they had been made secure. The Montana court said that the grantee was not an insurer against all damages which under any circumstances might be occasioned by the reservoir and dam, but that she was obligated in her maintenance and use of them, after she came into possession and control, to exercise reasonable care for the safety and property of others.

The reversal in *Anderson* for defects in instructions does not impair the basic holding outlined above. The defect appropriate to this consideration was the failure of the court to instruct the jury that the purchaser was not liable for negligence in the construction of the dam unless she knew, or in the exercise of ordinary care should have known, of the defective construction. This is consistent with the Restatement rule.

These cases are based upon a sound and reasonable rationale, and are appropriate recognition of the duty of a landowner not to use his property so as to unnecessarily or unreasonably damage his neighbor.

Appellees rely principally upon *Dover* v. *Georgia Power Company*, 46 Ga. App. 630, 168 S.E. 117 (1933), cert. den. by Georgia Supreme Court, but it is not as contrary to the New Hampshire and Montana cases as it might appear to be. As a matter of fact, it is cited as authority in *Anderson*. The opinion is per curiam and the court states that not all the evidence

was set out, but held that the question of the dam owner's liability for negligence under all the surrounding circumstances should have been submitted to the jury. The holding that an alienee was not responsible for defective construction of the dam unless it had notice (not knowledge) of any defects was accompanied by these remarks:

> * * * If it did not have notice of the defects in the construction, its duty was only to maintain the dam without negligence on its part. Negligence must be shown in order to recover in this action, and negligence is a failure to exercise due care; and due care in this case is such care as the party erecting, maintaining, or operating the dam is bound to use, and is in proportion to the extent of the injury which would be likely to result to third persons, provided the dam should prove insufficient and be swept away. Such a measure of prudence is required in such cases as a discreet person would use if the whole risk were his own. The general rule is that it is not enough that the dam is sufficient to resist ordinary floods. Great freshets must be guarded against, if the stream is occasionally subject to them. *City of New York* v. *Bailey,* 2 Denio, 433. But, if the dam is washed away by a phenomenal or extraordinary flood, such as no one would reasonably have anticipated, its owner is not liable for resulting damages (40 Cyc. 683m, subsec. C), provided no act of negligence of the defendant was the proximate cause of the break. See *Parrish* v. *Parrish,* 21 Ga. App. 275, 276 (1), 94 S.E. 315.

The dam in question there was acquired by a power company, but there was no evidence that a power plant, apparently for which the dam was built, had been operated by the power company after its purchase. This holding is actually consistent with the Restatement rule.

The evidence tends to show that the inadequacy of the spillway was obvious to a casual observer. The question whether reasonable care under the circumstances required an expert inspection of the dam and spillway was for the jury on the evidence presented, particularly in view of Burdick's expression of concern about the danger. The question of notice

was also proper for consideration by the jury. Consent may be a jury question. Furthermore, there was some evidence that the dam and spillway were not properly maintained. Appellants argue that there was no evidence that the spillway, if defective, caused the break in the dam. They overlook Dr. Grubbs's opinion that the overtopping of the dam resulted, at least in part, from the gross inadequacy of the spillway. The weight to be given that expert opinion was for the jury's determination.

As previously indicated, appellees owed a duty of care to appellants. There was evidence that the injury was caused by an instrumentality under the exclusive control of appellees. Certainly, it is reasonable to say that, in the ordinary course of things, the dam would not have broken if those in control had used ordinary care. There is no evidence that any act or negligence of appellants constituted a proximate cause of their injury.[1] Under these circumstances and in the absence of evidence to the contrary, the doctrine of res ipsa loquitur applies. *Fibber's Paint & Body Shop* v. *Reed,* 252 Ark. 1016, 482 S.W. 2d 832; *Dollins* v. *Hartford Accident & Indemnity Co.,* 252 Ark. 13, 477 S.W. 2d 179. It has been applied in analogous situations many times in cases too numerous to cite. 2 Speiser, Res Ipsa Loquitur, 490, § 31.5; Annot. 169 A.L.R. 529 (1947); Annot. 11 A.L.R. 2d 1192 (1950); 78 Am. Jur. 2d 666, Waters § 220.

Appellee argues that res ipsa loquitur cannot be applied because the damage was actually caused by an act of God, an unprecedented amount of rainfall, saying that there was ample evidence that the act of God was an important if not the sole cause of the injuries to the Dyes. We do not agree that the evidence showed that this rainfall was the sole cause, even if we assume that the rainfall was such an unprecedented one that it would otherwise relieve appellees of any duty to appellants. This is a matter of defense, however, which requires that appellees show that the act of God was the sole proximate cause of the damage to appellants, and that no

---

[1]Appellants' failure to act earlier or to call the defect to the attention of appellees is relevant to the question of consent, but it is not negligence or voluntary action which is to be considered as negligence as a contributing cause. See *Hollenbeck* v. *Dingwell,* 16 Mont. 335, 40 P. 863 (1895).

negligence on the part of appellees contributed to the cause in any way. *Manila School District No. 15* v. *Sanders,* 226 Ark. 270, 289 S.W. 2d 529. See also Annot. 169 A.L.R. 533 (1947). Where an act of God is the cause of an injury, but an act or omission of a defendant so mingles with it as to also be an efficient and cooperating cause, the defendant is liable. *Lee* v. *Crittenden County,* 216 Ark. 480, 226 S.W. 2d 79. These rules have been applied to an analogous case. *Mitchell* v. *Hahn,* 131 Ark. 286, 198 S.W. 528.

We recognize that there are jurisdictions in which the doctrine of absolute or strict liability would be applied to a case such as this, upon the theory espoused in *Rylands* v. *Fletcher,* LR 1 Ex. Ch. 265, 1 Eng. Rul. Cas. 236 (1866), afmd. LR 3 HL 330, 1 Eng. Rule. Cas. 256 (1868). There are numerous jurisdictions (a majority that might be called overwhelming) that reject it. See Annot. 169 A.L.R. 523 (1947).

*Rylands* v. *Fletcher* has found neither ready nor total acceptance in Arkansas. See *North Little Rock Transportation Co.* v. *Finkbeiner,* 243 Ark. 596, 420 S.W. 2d 874. It is at least doubtful that it would be applied to these facts even in England. See Prosser, Law of Torts (4th Ed.), 506, § 78; *North Little Rock Transportation Co.* v. *Finkbeiner, supra.* The rule against strict liability in this situation is more consonant with Arkansas law. See *Arkansas Power & Light Co.* v. *Orr,* 175 Ark. 246, 298 S.W. 1029; *North Little Rock Transportation Co.* v. *Finkbeiner,* supra. Strict liability would make the owner of a dam an insurer against all damages. *Fleming* v. *Lockwood,* 36 Mont. 384, 92 P. 962 (1907); *Anderson* v. *Rucker Bros.,* 107 Wash. 595, 183 P. 70, 186 P. 293, 8 A.L.R. 544 (1919).

One reason often given for rejection of strict liability is the burden that would be placed upon a legitimate activity which is in the interest of utilization and development of natural resources and the state's economy, such as advancement of agriculture. *Barnum* v. *Handschiegel,* 103 Neb. 594, 173 N.W. 593 (1919). It has been rejected, properly we think, where the waters of a natural watercourse have been impounded by the erection and maintenance of a dam by a riparian owner in a natural watercourse for a proper natural

use either public or private; with full recognition of the applicability of the rule of strict liability where the waters have been brought on the defendant's premises, where they did not belong, into an artificial reservoir so located as to constitute a menace to the safety of persons and property. *City Water Power Co.* v. *City of Fergus Falls,* 113 Minn. 33, 128 N.W. 817, LRA (ns) 59, Ann. Cas. 1912 A 108 (1910); *Barnum* v. *Handschiegel,* supra. See also, Prosser, Law of Torts, 507, 511 § 78. Dean Prosser has commented significantly on judicial consideration of the application of the rule. Some of his comments are:

> The place where all this occurs, the customs of the community, and the natural fitness or adaption of the premises for the purpose, all are highly important in determining whether the rule applies. * * *
>
> *****
>
> * * * The conclusion is, in short, that the American decisions, like the English ones, have applied the principle of *Rylands* v. *Fletcher* only to the thing out of place, the abnormally dangerous condition or activity which is not a "natural" one where it is.

The extent to which *Rylands* v. *Fletcher* has been applied in Arkansas is limited to Restatement of the Law, Torts §§519, 520. See *North Little Rock Transportation Co.* v. *Finkbeiner,* supra. The maintenance and use of a dam across a natural watercourse is not the type of ultra-hazardous activity defined by those sections. See Comment C, §520. Any risk of serious harm could be eliminated by the exercise of the utmost care, even if the pond or lake is not considered a matter of common usage. Although the pertinent sections have been revised, they should not be applied here if we should adopt them. The care required for elimination of an activity from the "abnormally dangerus" category is reasonable care; but the exercise of reasonable care could have eliminated the risk here. Furthermore, the activity was not inappropriate to the place it was carried on and the activity has some value to the community.

We find the rule of strict liability inapplicable.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

Harris, C.J., and Hickman, J., concur in part, dissent in part.

Carleton Harris, Chief Justice, concurring in part, dissenting in part. I agree with the Court, because of the testimony of Edward C. Grubbs, consulting engineer, that there was a jury question relative to whether the dam had been improperly designed and negligently constructed (the witness stated that the spillway as designed was completely inadequate to carry the water), and also whether the dam had been properly maintained, the evidence of Grubbs reflecting that growing trees, grass, rock, and debris were allowed to accumulate in the spillway.[1] But I very much disagree with the majority that this is a case which should have veen allowed to also go to the jury on the doctrine of *res ipsa loquitur*.

In the first place, I am firmly of the opinion that dams can break or collapse without negligence on the part of anyone, and this condition can be caused by excessive rainfall, earthquakes, etc. The record reflects that from June 6th through June 9th, in the area, there had been over nine inches of rain, and on the 8th and 9th there was considerable flooding in the area, creeks leaving their boundaries, and bridges and roads being washed out. In fact, the Benton County area was declared a disaster area by the President of the United States due to this flood. For *res ipsa* to apply, it must be shown that the injury or damage was caused by something under the exclusive control of appellees at the time of the occurrence. Certainly, no one would contend that appellees controlled the weather or the rainfall, and since I consider this to be, at least, a major reason for the damage sustained, I cannot see how the doctrine of *res ipsa* enters into the picture. This is not my view alone, for the Supreme Court of Iowa in *Eaves* v. *Ottumwa*, 38 N.W. 2d 761, used the same

---

[1] I also agree with the majority on Point IV that this is not a proper case for the application of strict liability.

logic. There, a raceway leading from a river to defendant's hydroelectric plant overflowed in a time of flood. The opening of the flood gates, which kept the level of the water in the raceway at that of the river, would have increased its carrying capacity, but these gates were not opened until hours after this could have been done. In its discussion, the Court said:

"Here the physical cause of plaintiff's damage was overflow from the race. Defendant's answer admits the race, hydroelectric plant and gates were under its exclusive control and management although it denies the res ipsa doctrine is applicable. Although defendant was in exclusive control of the race and gates, it cannot fairly be said the flood water flowing into the race from the river was *exclusively* under defendant's control and management. Such flood water is one of the instrumentalities that caused the damage.

Our decisions involving the res ipsa rule have uniformly stressed the necessity of defendant's complete and exclusive control of the instrumentalities that cause the injury. (Citing cases.)

Further, we think it may not fairly be said that in the ordinary course of things or, as frequently stated, according to common experience, water does not overflow the banks of such a race where those in control of the race exercise reasonable care. Evidence which may show negligence in this particular case is not to be considered in determining this question.

Certainly it is common experience for natural water courses to overflow their banks in time of heavy rains without lack of care by any human agency. Flooding of lowlands along swollen streams in wet seasons is common. It appears here the Des Moines River overflowed its banks and flooded other portions of Ottumwa at this particular time. Turkey Island and territory on all sides of it were under water. The dams were scarcely visible. That the water which caused the damage here escaped from an artificial channel that carries water from the river rather than from the river itself seems insuffici-

ent basis for an inference the occurrence was the result of negligence."

The doctrine of *res ipsa loquitur* is strongly predicated on two premises; first, that the damage would not have occurred unless somebody was negligent, and second, that the person allegedly causing the damage had exclusive control of the instrument, meaning that he had information concerning its functions that other people would not have. For instance, the *res ipsa loquitur* doctrine is generally applied in "soft drink" cases, where it is alleged that foreign matter in the drink consumed caused injury. Of course, the average person knows nothing about the procedure of manufacturing soft drinks, but more than that, the injured party is not in a position to establish negligence after the bottle has exploded and pertinent evidence has thus vanished. This leaves only the defendant with any exact knowledge of the cause of the mishap. Yet, we can certainly say that flies, spiders, or other foreign objects do not get into a bottled soft drink unless somebody was negligent. That is certainly a far cry from the case presently before us! As stated in *Eaves* v. *Ottumwa,* supra:

> "The underlying reason for the res ipsa rule or, as Dean Wigmore expresses it, 'the particular force and justice' thereof, is 'that the chief evidence of the true cause . . . is practically accessible to him (defendant) but inaccessible to the injured person.' (Citing authorities.)
>
> It does not appear that the chief evidence of the cause of the overflow from the race was accessible to defendant but inaccessible to plaintiffs. Apparently such evidence was equally accessible to plaintiffs as to defendant. The underlying reason for the application of the res ipsa rule is therefore not here present."

Here, it is obvious that appellants were not precluded, after the dam washed out, from offering evidence of specific acts of negligence; in fact, they did do so, and the reversal on Points I and II is based on that evidence. Accordingly, I cannot see where *res ipsa* has any place in this case at all, and therefore respectfully dissent to this portion of the opinion.

HICKMAN, J., joins in this concurrence and dissent.