FIRST ELECTRIC COOPERATIVE CORPORATION
*v.* Leon Carroll PINSON and Russell WILHITE

82-161                                                  642 S.W.2d 301

Supreme Court of Arkansas
Opinion delivered November 22, 1982

*William H. Sutton* of *Friday, Eldredge & Clark,* for appellant.

*Phillip B. Farris* of *Highsmith, Gregg, Hart & Farris,* for appellee Pinson.

*H. David Blair,* for appellee Wilhite.

JOHN I. PURTLE, Justice. This is a tort action from the Circuit Court of Independence County, Arkansas, wherein appellant was found liable to the estate and heirs of three young men who were electrocuted when a boom on a vehicle contacted an overhead power line. The appellant argues six points for reversal. We reach only the first point because we find no evidence of negligence sufficient to support the verdicts. Therefore, we reverse and dismiss the cases.

On July 4, 1980, Russ Wilhite, d/b/a Art Sign Company, sent his son, Lew Wilhite, to erect a sign at Homer's Bait Shop. Before arriving at the site where the sign was to be erected Lew picked up his friends, Ricky and David Pinson. The pole which was to support the sign was transported to

the scene on a truck driven by Lew Wilhite. The truck had a bed-mounted boom with a connected cable used in raising or lowering materials. The evidence indicates that Lew Wilhite was on the back of the truck operating the boom and the two Pinson boys were on the ground when the boom came in contact with overhead power lines, owned and operated by the appellant. When the boom contacted the power line, it served as a conductor. The electricity flowed through the boom and into the bodies of the Pinson boys, who were alongside the truck apparently holding the pole which was to be erected on the site.

Wilhite, upon discovering that electricity was flowing through the boom into the bodies of his friends, commenced yelling and jumped off of the bed of the truck. He attempted to enter the truck, but upon touching the door of the truck he, too, became a conduit for the electricity. It is obvious that Wilhite intended to drive the truck away from the power lines but was unable to do so. The Pinson boys and Wilhite were all electrocuted on the spot.

The parents of each of these young men, all of whom were minors, filed suit for damages. The Pinsons originally sued Wilhite who filed a third complaint against First Electric Cooperative Corporation, the appellant. Subsequently, the Pinsons joined in the complaint against the appellant. The claims against Wilhite were settled prior to trial. The two cases against appellant were consolidated. The jury returned verdicts against the appellant in favor of each of the plaintiffs' heirs and estates: in the amount of $120,000 for Lew Wilhite's heirs and estate; $101,000 for Ricky Pinson's heirs and estate; and, $101,000 for David Pinson's heirs and estate.

The only evidence of negligence presented against the appellant was the failure to set a reclosure on the power line at 140 amps instead of the 200 amps which was used at the time of the occurrence. So far as the record is concerned, the appellant was not alleged to be negligent in any other respect. The evidence indicates that a reclosure works in a similar manner as how an average person considers a circuit breaker to work. If the fault or drag had reached 200 amps,

the reclosure would have opened within one second of such contact. This would cut off the electricity flowing at that particular point. It would cut off for one third of a second, then come back on and stay on, or reclosed, 10 seconds before tripping again. It would then remain off for 15 seconds and come back on for 10 seconds. After tripping the third time it would remain locked out until it was physically reconnected at the power station. There is some dispute as to whether or not the pole the boys were holding was touching the ground. If it were, it would have created enough "fault" on the line to cause the reclosures to cut off the electricity for a fraction of a second. There is no dispute that Lew Wilhite was on the back of the truck, where he was insulated from the electricity, for more than a second after the boom contacted the power line. The electricity caused the truck to become so charged that flames were reaching from the truck to the ground which caused the tires on the vehicle to catch fire and blow out. When this occurred, the rims on the truck came in contact with the ground and at that time the boom separated from the power line to which it had been attracted.

The appellees contend that it was the duty of the appellant to keep the reclosure on the lowest possible setting allowing appellant to continue providing service to its customers. It is undisputed that the appellant's ability to deliver electricity would not have been impeded at a setting of 140 amps. Neither is it disputed that the actual setting was at 200 amps. If the pole had contact with the ground while the boom was still in contact with the live overhead current, the "fault" created would exceed 140 amps. Testimony indicated such a connection could generate up to 1,000 amps. It appears reasonable that the "fault" would have, no doubt, exceeded the 200 amp setting. In fact, when the wheels of the vehicle contacted the ground, the boom and the power line separated allowing the power line to swing some eight inches back away from the boom. It seems logical that the reclosure activated at that time and caused a brief interruption of the current which allowed the boom and the wire to disengage. The testimony indicated that a human body would place at the most about 7 1/2 amps on the power line. Therefore, if all three of the decedents had contacted the power line simultaneously, directly or indirectly, the fault or

amps would not be more than 22 1/2. This is far below the level it would have taken to open the reclosure if it had been set at 140. It is possible that the reclosure did not disconnect until the drain was well in excess of 200 amps. It does not make any difference how much "fault" it would have taken to trigger the reclosure because we find as a matter of law that the acts of the appellant in keeping the 200 amp reclosure in service were neither negligence, nor the proximate cause of this most unfortunate and regrettable occurrence.

Foreseeability is a necessary ingredient of actionable negligence in Arkansas. *Dollins* v. *Hartford Accident & Indemnity Co.*, 252 Ark. 13, 477 S.W.2d 179 (1972); *North Little Rock Transportation Co.* v. *Finkbeiner*, 243 Ark. 596, 420 S.W.2d 874 (1967); *Collier* v. *Citizens Coach Co.*, 231 Ark. 489, 330 S.W.2d 74 (1959); and *Hill* v. *Wilson*, 216 Ark. 179, 224 S.W.2d 797 (1949). We have said: "Conduct becomes negligent only as it gives rise to appreciable risk of injury to others . . ." *Dollins.* Also, we held that there is no negligence in not guarding against a danger which there is no reason to anticipate. *North Little Rock Transportation Co.* In the case of *Durfee* v. *Dorr*, 123 Ark. 542, 186 S.W. 62 (1916), we held that the keeper of a hospital ". . . is liable for damages if he fails to perform some duty which he owes to the patient and the patient is injured as a result of this failure." We have a similar question before us in the present case. The question presently to be considered is whether the appellant had a duty to keep the reclosure switch at the lowest possible setting. There is a duty on the part of one in charge of a dangerous instrumentality to protect against danger if he knew or should have known that the situation was dangerous. *North Little Rock Transportation Co.* However, the evidence indicated that the higher setting of the reclosure in no manner increased the risk of harm to the decedents. There was no foreseeability that a boom would contact the power lines which were more than twenty feet above the ground.

The evidence in this case simply does not support the jury's verdicts. Conjecture and speculation, however plausible, cannot be permitted to supply the place of proof. *Glidwell, Admr.* v. *Arkhola Sand & Gravel Co.*, 212 Ark. 838,

208 S.W.2d 4 (1948). We stated in *Kapp* v. *Sullivan Chevrolet Co.*, 234 Ark. 395, 353 S.W.2d 5 (1962), that judgments based on speculation and conjecture will not be allowed to stand. We believe the jury verdicts in this case were based upon conjecture and speculation. Therefore the cases are reversed and dismissed.

Reversed and dismissed.