BELLAIRE *v.* WORCESTER LUMBER CO.

1. LOGS AND LOGGING — CONTRIBUTORY NEGLIGENCE — FLOODING LANDS—WATERS AND WATERCOURSES.

In an action brought by plaintiff for causing his lands to be flooded by a jam formed by defendant's logs that obstructed the river, plaintiff was not chargeable with contributory negligence for permitting a birch tree to remain in a leaning position over the stream so as to obstruct defendant's drive.[1]

2. SAME—RIVERS—NAVIGATION—NEGLIGENCE.

That defendant suffered a jam to form of logs which its employees were driving down a stream, filling the banks for a considerable distance up the stream past plaintiff's property, that none of defendant's men were within five miles when the conditions arose, and from one and a half to two and a half days elapsed before the men arrived to break the jam which caused plaintiff's land to be flooded and washed out, furnished evidence of negligence.

3. SAME—RIPARIAN RIGHTS—DRIVING LOGS.

No liability would arise from a jam produced by natural causes, unless, by the exercise of due care, the formation of the jam could have been avoided, but the law requires persons so engaged in driving logs to use due diligence and to employ such number of men and means as will accomplish the object of breaking any jam that may form, without undue delay.

4. SAME—DAMAGES—WEIGHT OF EVIDENCE.

But a judgment for $1,057 was excessive, on testimony tending to show that the total value of the land damaged was $275, that the cost of diking the river amounted to $550 and other damages did not exceed $20 in all.

5. SAME—REAL PROPERTY—MEASURE OF DAMAGES.

The measure of damages would be the diminution in value of plaintiff's farm through the effects of defendant's negligence.

---

[1] On the question of, liability for injuries to riparian owner by running logs in stream, see notes in 41 L. R. A. 494; 64 L. R. A. 983, 986, and 35 L. R. A. (N. S.) 824.

Error to Houghton; Streeter, J. Submitted June 20, 1913. (Docket No. 67.) Decided September 30, 1913.

Case by Joseph Bellaire against the Worcester Lumber Company for damages to plaintiff's lands. Judgment for plaintiff. Defendant brings error. Reversed.

*Allen F. Rees,* for appellant.

*O'Brien & Le Gendre (George O. Driscoll,* of counsel), for appellee.

Steere, C. J. Plaintiff recovered from defendant a verdict and judgment in the circuit court of Houghton county in the sum of $1,057 for damages claimed to have been done his land by defendant while driving logs down Sturgeon river in the spring of 1908.

The Sturgeon river is a well-known logging stream of the upper peninsula of Michigan; large quantities of forest products having been cut on its shores and tributaries, and driven down it each spring in the time of high water for many years. It is admittedly a navigable stream for such purposes.

Plaintiff is a farmer, owning and occupying a farm of 80 acres bordering on said river near its mouth in a section of low, fertile land known as "Sturgeon river flats." The action of the river through these flats has caused its banks to be slightly higher than most of the adjacent lands, which lie but little above the surface of the water at its normal stage, and during the spring freshets the flats are often overflowed.

Defendant is a lumbering company, operating a sawmill at Chassel, near the mouth of the river, and at the time in question had been lumbering its timber lands upon said stream and its tributaries for several years, floating the logs down it to its mill.

In the spring of 1908 defendant drove its logs, which were cut at various points up the river, down

to the mill as usual. On April 20th, shortly after the drive started, a log jam formed in the river nearly a mile, by the winding channel, below plaintiff's house, and on, or just below, his land at a point where a large birch tree grew leaning over the water, damming the stream so as to cause the river above to rise and overflow his property, spreading logs and sand over a portion of it, cutting the banks and washing a new channel across a sharp bend of the winding stream.

Defendant's negligence and the resulting injury are stated in plaintiff's declaration to consist of wrongfully and negligently permitting the logs defendant was driving to accumulate, obstruct, and dam up said river on plaintiff's land, and neglecting to properly direct, drive, and float said logs so as to keep them clear of the land, whereby said river became greatly dammed up; and that defendant did also wrongfully and negligently fail to furnish a sufficient number of men to drive the logs without jamming, as a consequence of which neglect, plaintiff's land was overflowed, logs, sand, and other *debris* deposited thereon, the soil washed out and gullied, and a new channel cut, rendering it necessary to build breakwaters to protect the banks and a bridge to reach a portion of the land cut off by the new channel.

At the conclusion of plaintiff's testimony, and again at the conclusion of all the evidence, defendant's counsel moved for a directed verdict in its favor, for the reason there was no evidence of negligence on the part of defendant, and, if there was any evidence of the jam damaging the premises in question, plaintiff was guilty of contributory negligence; again, after verdict and judgment, moving for a new trial, because the verdict was against the great weight of evidence, was excessive, and contrary to the instructions of the court. These motions were

denied, and defendant has brought the case here for
review on a writ of error.

The contributory negligence imputed to plaintiff is
his permitting the birch tree, which leaned over the
river where the jam formed, to remain there, as a
menace and, as it proved, an obstruction to the drive.
Had it been shown plaintiff was guilty of some
affirmative act in that connection, this contention
might require more serious consideration. Defend-
ant's own testimony disclosed that along the river
there were a great many leaning cedar, birch, and
other trees, and that for trees upon the declining
shores to tip or lean over the water was "a common
occurrence along the river bank." This birch was
growing on the shore of the stream in its natural
state, undisturbed except by the operations of nature.
It is not shown that plaintiff ever disturbed it in any
manner, or, though it leaned low over the water, that
it ever interfered with the natural flow of the river.
The trouble came from defendant's use of the river
for purposes of navigation in driving its logs upon it.
No obligation rests upon a riparian owner to clear or
deepen a stream flowing past or through his land to
make it navigable for any purpose. Defendant's
rights upon this river, through plaintiff's land, were
its use for such navigation as it was naturally
adapted to, which was the floating of logs. For that
use it was, in its nature, a highway. Defendant had
the right to so use it in the customary and ordinarily
prudent manner. When thus using it, defendant was
not liable for any damages resulting to adjacent lands
by reason of its proper and prudent exercise of such
right. For any abuse or negligent misuse of such
right resulting in injury to the shore owner, it would
be liable. These principles are too well established
in this State to require discussion or citation of
authority.

We are unable to accept defendant's contention that there was no evidence of negligence on its part to be submitted to a jury. It is undisputed that, while defendant was driving its logs down the river, a jam formed on or just below plaintiff's land, filling the banks several logs deep at the jam, and extending upstream through plaintiff's property for some distance, variously stated by different witnesses at from 600 or 700 feet to a quarter or a third of a mile; that none of defendant's men was within 5 miles of the jam when it occurred, nor did any reach there until at least 2 nights and a day later, as stated by defendant's foreman, and 2½ days, as stated by a witness of plaintiff, who saw the jam form, and assisted his father in an unsuccessful attempt to break it, after which the father sent word to defendant, being solicitous about the matter because he owned and resided upon land further down the river.

It is well settled that parties engaged in driving logs upon a river naturally navigable for such purpose are not liable for damages caused by jams formed by natural causes, unless, by the exercise of due care, the formation of such jams could have been avoided; but it is "their duty to exercise due diligence in running the logs, and in breaking such jams as are formed by natural causes," and—

"They would be liable for such damage as may be caused from unnecessary or unreasonable delay in removing them. They are required to use due diligence, and to employ such number of men and means as will accomplish the purpose of breaking such jams within a reasonable time, having in view all the circumstances." *Bauman* v. *Boom Co.*, 66 Mich. 544 (33 N. W. 538).

Plaintiff's testimony tended to show that in driving this river it was necessary and customary to keep men along with the logs to "pike them along;" that this jam formed at the head of the drive shortly after

the logs began to run at that point; that there were no men coming along with that end of the drive, nor within over five miles of it, and that none of defendant's men reached there until 2½ days later, and then only after notice of the jam was sent to defendant by outside parties; that after the jam· formed logs were continually sent down against it from upstream, so that, as it increased, the river was jammed with logs to its bottom for some distance above, through plaintiff's land, setting back the water, and causing it to cut through the banks, flooding plaintiff's fields, cutting a new channel across a bend before relief came.

With such testimony in the case, defendant's negligence was a question for the jury. In *Anderson* v. *Boom Co.*, 61 Mich. 489 (28 N. W. 518), involving the flooding of lands by a jam of logs which defendant was driving, it is said:

"It was for the defendant to show the actual condition of the logs and of the water, and to state what was done to move the logs and prevent the overflow, and then it was for the jury to determine whether or not there were unnecessary jams causing the flowage and damage."

See, also, *Hopkins* v. *Commercial Co.*, 16 Mont. 356 (40 Pac. 865).

While we conclude that there was evidence to go to the jury on the questions of its negligence and resulting damage, a careful examination of the record impels to the view that defendant's contention, presented in its motion for a new trial, that the verdict was contrary to the instructions of the court, and, in part at least, against the weight of evidence and excessive, is well founded.

The jam of logs occurred on April 20th, at a time when there were no growing crops upon the land. The flooding of Sturgeon river flats by spring freshets is an annual occurrence. The land is said to

be enriched from the silt distributed over it during these floods, which are accounted a general benefit; the soil of the flats being known as a silt loam. Plaintiff claims, however, that the flood from the jam was more sudden and severe than the natural ones; that it cut through the retaining banks, instead of quietly flowing over them, and carried quantities of sharp sand, instead of floating silt, upon his fields, leaving a coarse and sterile deposit of sand in the lower places, through which vegetation would not grow, smothering the meadows, and destroying the fertility of the soil; that it cut a new channel across a bend of the river, and shut off access, without a bridge, to land within the former bend of the stream, and that, to restrain future excessive overflow and prevent the banks from further washing, it was necessary to build revetments at certain places to keep the river in its channel.

The neck of land across which the new channel cut is conceded to have been very narrow; a surveyor sent by defendant to measure and compute areas, and whose testimony in that particular is not disputed, states it was not over 15 feet across it from one bank to the other, and the area washed out by this new channel was fifty-seven thousandths of an acre. The river formed quite a large loop at this point, mostly on adjoining lands; the portion of plaintiff's land within the loop being a small triangle, which was not cultivated. Defendant's testimony is to the effect that there were no such unusual results as claimed by plaintiff; that about the same amount of land was flooded and in the same manner as usual at that time of the year; that good crops subsequently grew upon the land claimed to have been injured by the deposit; that the washing of the banks and cutting of the short new channel was the natural result of the spring freshet, and did little, if any, damage. The conflicting testimony upon this subject presented, of

course, an issue of fact for the jury within certain limits; but, according to a map of the locality upon which plaintiff and his witnesses pointed out the portions claimed to have been injured by the overflow, there were less than 3¾ acres injured by the deposits upon them. The highest estimate given by any of them was 5 acres. The trial judge, in his charge to the jury, said:

"But the highest value that is put upon that land, gentlemen, is $65 (per acre). The lowest value which is put upon the land in its present condition is $10 (per acre), so that the amount of damages to be allowed for that acreage, whatever it was, if any, must be between those two extremes, and in arriving at that you will consider the testimony of the other witnesses varying from no damage at all to this $65."

The testimony sustains these statements as to the highest and lowest values, and according to plaintiff's highest and lowest estimates we find not to exceed five acres of his land were damaged $55 per acre, amounting to $275. The court further instructed the jury that by the pleadings and proceedings during the trial—

"There was no question of any bridge across the cut-off or access to lands further up the river except the damage by the soil actually taken away" and "injury to that acre and three-quarters or two acres, which was testified to in the case, the extreme value I think was put at $20 an acre, $10 or $20, but no further."

It could well be contended that the straightening of the river at this point was a benefit rather than an injury, and under the evidence of plaintiff the damage, if any, was very small.

The plaintiff did work along the river, building a breakwater, or retaining wall of timber to prevent the current further cutting away the banks and flooding his land; his estimate of the cost of this work was $557.25, and it was his claim that this was made

necessary by the washing of the natural banks at the time of the jam. It is the contention of defendant, not only that the testimony overwhelmingly showed that this work was unnecessary, of little value, and could not have legitimately cost what plaintiff claimed (which might be a question of fact), but that the plaintiff could not recover under any circumstances more than the entire value of the maximum amount of land which he claims was damaged.

If it appeared that the injury to the acreage damaged, which was shown to be several spots distributed over different parts of the farm, depreciated the whole value of the farm, the damages would not be limited by the difference in value of the exact spots injured. The measure of damage would be the damage done to plaintiff's farm as an entirety through defendant's negligence, whatever the various elements might be.

In denying defendant's motion for a new trial, the court said: "The verdict was for a larger amount than was warranted under the charge," and it may be added, for a manifestly larger amount than was warranted by the evidence.

Accepting plaintiff's claim that defendant was responsible for all the damages he offers evidence in relation to, and rejecting all of defendant's testimony in denial and reduction of said claim, some of which is practically undisputed, and, taking plaintiff's highest estimates, we have $275 for the reduction in value of the acreage flooded, and $557.25 for labor and timber in building a breakwater, the items of which are not given, with $20 for the questionable claim by reason of the cut-off, as mentioned by the court in its charge, and adding interest from the date of the jam we find the total loss less, by a substantial sum, than the verdict rendered. It is evident that the verdict is beyond any testimony in the case to support it.

In our opinion, a verdict for the maximum amount claimed by plaintiff in his testimony would be excessive, and contrary to the weight of evidence as disclosed by this record.

The judgment is reversed, and a new trial is granted.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.