874 F.2d 1236
 E. RITTER & COMPANY, a Corporation, Appellee,
v.
DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, An Agency of the
United States of America, Appellant.
E. RITTER & COMPANY, a Corporation, Appellant,
v.
DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, An Agency of the
United States of America, Appellee.
 Nos. 88-1368, 88-1399.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 21, 1988.
Decided May 3, 1989.
 
 A. Doug Chavis, Asst. U.S. Atty., Little Rock, Ark., for appellant.
 Paul McNeill, Jonesboro, Ark., for appellee.
 Before WOLLMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BEAM, Circuit Judge.
 BEAM, Circuit Judge.
 
 
 1
 E. Ritter & Company (Ritter) sued the United States government, Department of the Army, Corps of Engineers, under the Federal Tort Claims Act. It sought reimbursement for permanent damage to its land caused by erosion. Ritter alleged that the Corps negligently constructed a flood control ditch which runs through the land. The design of the ditch effected the erosion. The district court[1] awarded Ritter $5600 for lost income, $20,000 for diminution in the value of the land, and $50,000 for the cost of repairs which were necessary to prevent further erosion. We affirm.
 
 I. BACKGROUND
 A. Facts
 
 2
 The Rivervale Outlet Ditch (ROD), part of the St. Francis Basin Flood Control Project, borders, for 3.8 miles on the west boundary, a 600-acre tract of Ritter's land. Two thirds of the 600-acre tract drains toward the ROD. The ROD is 9.3 miles long and 150 feet wide, top bank to top bank. The ditch is situated upon, but not centered within, a 400-foot wide easement, a portion of which the United States purchased from Ritter in 1976. The easement extends approximately forty-five feet from the top east bank of the ROD eastward into Ritter's crop land. The language of the easement gives the government the right to "excavate, dredge, cut away and remove any and all land" within the easement.
 
 
 3
 The 600-acre tract was subject to substantial erosion which formed sixty to sixty-five gullies. The parties stipulated that the cause of the erosion was the runoff of normal rainfall from Ritter's land into the ROD. The erosion also caused annual topsoil loss to increase from 3.8 tons per acre, prior to construction of the ROD, to fifteen tons per acre after construction.
 
 
 4
 The land was farmed close to the banks of the ROD, and no action was taken by either party to prevent erosion. Since 1936 when major drainage work was implemented by Congress as a means of flood control, the Corps apparently has followed acost-sharing policy wherein the federal government bears a major portion of the expense of a drainage project and those who benefit from the project share part of the cost. Under this policy, a landowner benefitted by a drainage ditch is responsible for controlling runoff into the ditch. However, this cost-sharing policy was never communicated to Ritter. In addition, on at least four or five occasions, the Corps promised to fix the "washouts" but each time failed to take any remedial action.
 
 B. The District Court Opinion
 
 5
 At trial, Ritter asserted theories of negligence and inverse condemnation. The district court severed the possible inverse condemnation claim, believing that the amount in controversy would exceed $10,000. Under the Tucker Act, the United States Claims Court would have exclusive jurisdiction of such a claim. E. Ritter & Co. v. Department of the Army, Corps of Eng'rs, No. J-C-85-215, slip op. at 1-2 (E.D.Ark. Aug. 31, 1987). The court then analyzed the government's affirmative defenses, the negligence issue, and the resulting damages.
 
 
 6
 The government initially argued the defense of statutory immunity under 33 U.S.C. Sec. 702c (1982), which provides in part, "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place * * *." The district court held that "the plain meanings of the words 'flood' and 'floodwaters' cannot be stretched far enough" to include the flow of water from normal rainfall, which normal rainfall the parties have stipulated to be the cause of the erosion on Ritter's land. Ritter, No. J-C-85-215, slip op. at 2-3.
 
 
 7
 The government also argued that the discretionary function exception to the Federal Tort Claims Act (FTCA) prohibited Ritter's cause of action. The district court agreed with the government that if the Corps' decision-making with respect to the ROD was classified as a "planning" decision, then the exception would apply. If, however, the decision was actually an "operational" activity, then the government would be subject to suit under the FTCA. The court did not agree with the government's argument that the decision not to stabilize or maintain the banks of the ROD falls into the "planning" category. The district court determined that this inaction by the Corps was ministerial, not analytical, in nature and thus concluded that the Corps' decision was "clearly" operational. Id. at 4-6.
 
 
 8
 After dismissing these affirmative defenses, as well as others not at issue here, the district court reviewed the facts and determined that the sole reason for the erosion was the Corps' excavation of the ditch. The court found it "significant" that the amount of erosion was normal prior to construction of the ditch and concluded that the evidence confirmed the severity of the new erosion. The court noted that both parties agreed that the erosion would continue unless affirmative, remedial action was taken. The district court stated that the "critical fact" was the Corps' failure to prevent predictable erosion when preventive measures would have been a minor undertaking. The court concluded that the Corps had refused to take responsibility for erosion control when such responsibility was required of it, and Ritter was not responsible under the Corps' cost-sharing policy because this particular land received no benefit from the ROD. Id. at 9-12.
 
 
 9
 Assessing damages, the district court ordered the government to compensate Ritter for annual loss from diminished rent, the decline in the fair market value of the land, and $50,000 to be used by Ritter to pursue stabilization of the continuing erosion. On appeal, the government contends that the district court erred in its determination of all of the above issues.
 
 II. DISCUSSION
 A. Floodwater Immunity
 
 10
 Discussing the scope of review, Ritter argues that the existence of a flood or flood waters is a question of fact, not to be overturned unless clearly against the preponderance of the evidence. The government contends that the application of section 702c is a question of law subject to de novo review. We review this issue de novo, for two reasons. First, in this circuit, the question of immunity is generally a question of law. See Garionis v. Newton, 827 F.2d 306, 309 (8th Cir.1987). Second, we believe that the question here is not whether, factually, normal rainfall constitutes a flood (for surely it does not), but rather, whether, legally, "flood" and "flood waters," as used in section 702c, encompass a normal rainfall condition. After review of the applicable law, we agree with the district court that they do not.
 
 
 11
 The government contends that the district judge erroneously held that the Corps is not immune from liability under 33 U.S.C. Sec. 702c. The government argues that the definitions of flood and flood waters have been interpreted broadly enough to include situations involving normal rainfall. Ritter claims that every case relied on by the government is distinguishable.
 
 
 12
 Decades ago, we noted that the congressional intent of section 702c was to keep the government entirely free from liability when floods occur, despite attempted control by federal flood control projects. National Mfg. Co. v. United States, 210 F.2d 263, 270-71 (8th Cir.), cert. denied, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108 (1954). More recently, we reiterated that the purpose of 33 U.S.C. Sec. 702c is to "assure the government of absolute immunity for flood control projects so that Congress can safely appropriate the vast sums of money necessary for flood control without fear of further expense should any project itself result in flooding." Portis v. Folk Constr. Co., 694 F.2d 520, 522 (8th Cir.1982) (citing National Mfg., 210 F.2d at 270-71). Furthermore, we have held that "unusual or extraordinary climactic conditions" are not required. Immunity exists for "man-made" floods as well as natural flooding. Burlison v. United States, 627 F.2d 119, 121 (8th Cir.1980). While these cases recognize that the governmental immunity for flood damage is expansive, they do not extend immunity to every damage caused by water.
 
 
 13
 A recent Supreme Court case, United States v. James, 478 U.S. 597, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986), seems to expand the definitions of the terms "flood" and "flood waters." James involved two cases with similar fact patterns: plaintiffs' decedents were engaged in recreational water activities on a lake which had been created as a result of flood control projects, and they drowned when the flood gates were opened without warning and the velocity of the water sucked them through the dam outlet. Id. at 599-601, 106 S.Ct. at 3118-19. The issue specifically addressed by the Court was whether section 702c barred liability for personal injuries caused by the government's negligent failure to warn of dangers caused by the release of flood waters from federal flood control projects, where the United States would otherwise be responsible under the FTCA. Id. at 598-99, 106 S.Ct. at 3118. The Court stated:
 
 
 14
 Nor do the terms "flood" and "flood waters" create any uncertainty in the context [of this case]. The Act concerns flood control projects designed to carry flood waters. It is thus clear from Sec. 702c's plain language that the terms "flood" and "flood waters" apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control.
 
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 [S]tatements [of congressional intent] show that the sweeping language of Sec. 702c was no drafting inadvertence. Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the Government from "any" liability associated with flood control.
 
 
 18
 James, 478 U.S. at 605, 608, 106 S.Ct. at 3121, 3123 (emphasis added) (citation omitted). Holding that immunity existed, the Court noted that, in this situation, the negligent failure to convey warnings is part of the "management" of the flood control project. Id. at 610, 612, 106 S.Ct. at 3124, 3125.
 
 
 19
 A recent Ninth Circuit case recognizes that James broadened the definition of flood waters for the purposes of section 702c. McCarthy v. United States, 850 F.2d 558, 563 (9th Cir.1988). "This definition of floodwater suggests that the term includes both 'waters that are out of control' and 'water at a flood control project.' " Id. at 561 (quoting James v. United States, 760 F.2d 590, 594 n. 6 (5th Cir.1985) (en banc), rev'd, 478 U.S. 597, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986)).
 
 
 20
 We agree that James has provided a broad definition of the terms "flood" and "flood waters," as they occur in section 702c, beyond their common meaning of water which inundates land. James expands the term "flood waters" to include water contained in or carried through a flood control project. Undisputedly, the ROD is part of the St. Francis Basin Flood Control Project, and the water involved here was eventually carried through the ROD. At the time the damage occurred, however, the water was "normal rainfall" and had not yet entered the boundaries of the flood control facilities. Thus, while section 702c relieves the United States from liability for "any damage," immunity is only available when that damage is "from or by floods or flood waters." We cannot read this language so broadly as to include normal rainfall which has not yet come in contact with a flood control project. Therefore, we conclude that section 702c does not provide immunity to the government under the facts of this case.
 
 B. The Discretionary Function Exception
 
 21
 Ritter's claim against the United States falls within the ambit of the Federal Tort Claims Act, which authorizes monetary civil claims against the federal government for loss of property caused by the negligent act or omission of any government employee acting within the scope of his or her employment. 28 U.S.C. Sec. 1346(b) (1982). The government argues for immunity under the discretionary function exception to the FTCA, which exception provides that section 1346(b) shall not apply to
 
 
 22
 [a]ny claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
 
 
 23
 28 U.S.C. Sec. 2680(a) (1982).
 
 
 24
 In enacting section 2680(a), Congress intended to waive governmental immunity for ordinary common law torts while retaining immunity for acts of a governmental nature or function. Dalehite v. United States, 346 U.S. 15, 27-28, 73 S.Ct. 956, 963-64, 97 L.Ed. 1427 (1953). The discretionary function exception was
 
 
 25
 "intended to preclude any possibility that the [FTCA] might be construed to authorize suit for damages against the Government growing out of an authorized activity, such as a flood-control or irrigation project, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious."
 
 
 26
 Id. at 30, 73 S.Ct. at 965 (quoting H.R.Rep. No. 2245, 77th Cong., 2d Sess. 10).
 
 
 27
 The discretionary function exception protects governmental decisions which are "grounded in social, economic, and political policy." United States v. Varig Airlines, 467 U.S. 797, 814, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). Though "discretionary function" is a difficult concept to specifically define, the Supreme Court has stated that it includes "initiation of programs and activities" as well as "determinations made by executives or administrators in establishing plans, specifications or schedules of operations." Dalehite, 346 U.S. at 35-36, 73 S.Ct. at 968 (footnote omitted).
 
 
 28
 The discretionary function analysis is two-fold. First, a court must consider whether the conduct of the government employee is the product of choice. Berkovitz v. United States, --- U.S. ----, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). If the challenged action does involve an element of judgment or choice, the court must then determine if such conduct is based on considerations of public policy. Id. 108 S.Ct. at 1959. In sum, "[t]he discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment." Id. 108 S.Ct. at 1960.
 
 
 29
 "Cases in this circuit have consistently held that the FTCA applies to decisions by federal agencies at the 'operational' level, whereas decisions or omissions on the 'policy or planning' level are exempt under the statute's discretionary function exception." In re Estate of Gleason v. United States, 857 F.2d 1208, 1209 (8th Cir.1988) (citations omitted). "The planning level consists of decisions involving questions of policy, that is, the evaluation of the financial, political, economic and social effects of a plan. On the other hand, the operational level involves decisions relating to the normal day-to-day operations of government." Madison v. United States, 679 F.2d 736, 739 (8th Cir.1982).
 
 
 30
 Naturally, the government argues that the Corps' activity falls into the "planning" category. The government claims that the evidence shows that the design of the ditch was based on social, economic, and political factors, such as (1) cost-benefit studies of placing spoil from the ditch only on the opposite bank instead of on both sides, (2) the fact that the project was designed with input from public hearings and the local drainage district, and (3) the fact that the drainage district may levy taxes and thus is a "political and social creature." The government also bases this argument on their "cost-sharing policy."
 
 
 31
 The district court rejected these arguments. The court determined that Ritter's land was not benefitted by the ROD, and therefore the cost-sharing policy would not apply to Ritter. The court also noted that the government is not being sued for its determination that the ROD be built or for the location of the ROD, but rather, for its decision to ignore "the corollary task of supporting and maintaining the banks of the ditch." Ritter, No. J-C-85-215, slip op. at 5-6. We agree.
 
 
 32
 The policy considerations which the government cites refer to the initial decision to build the ROD and the subsequent decisions as to where the ROD and the spoil would be located. These considerations go to the design and construction of the ditch, which we agree were planning level decisions. As such, the design and construction of the ROD are governmental actions which fall within the perimeter of the discretionary function exception and are not actionable.
 
 
 33
 Once construction was completed, policy decisions ended. The district court recognized that the Corps' responsibilities, however, did not end after construction of the ROD was complete. Even though the Corps of Engineers knew that this construction of the ROD would cause erosion of adjoining land, the Corps failed to maintain the banks of the ROD in proper fashion. In addition, the Corps failed to inform Ritter of its cost-sharing policy and repeatedly reassured Ritter that the problem would be rectified. These acts and omissions, which constitute maintenance and operation of the ROD after construction, do not involve policy concerns of the type which Congress intended to protect. Rather, they involve the most basic form of operational, ministerial conduct. The Corps' decision not to maintain the banks of the ROD was not of a discretionary nature and therefore does not come within the protection afforded by the discretionary function exception.[2]
 
 C. Negligence
 
 34
 Under the FTCA, the standard of liability for the government is the same as that for a private person, the prudent person standard. The FTCA provides that the government will be liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. Sec. 1346(b) (1982). In Arkansas, as in most jurisdictions, the failure to do what a person of ordinary prudence would do under the same or similar circumstances constitutes negligence. Oliver v. Hallett Constr. Co., 421 F.2d 365, 368 (8th Cir.1970) (citations omitted).[3] The district court concluded that, under this standard, the government's conduct made it liable for damage done to Ritter's land.
 
 
 35
 The district court determined that the Corps, once it undertook construction of the ROD, had a duty to assure that the inevitable eroding of its banks would not occur and obviously failed to discharge that duty. In its analysis, the trial court intertwined negligent design and negligent maintenance of the ditch. As we have stated, the Corps is immune from allegations of negligent design, and therefore we may not rely on that portion of the district court opinion which is based on negligent design. Our analysis, therefore, turns to negligent maintenance of the ROD.
 
 
 36
 The ROD was designed in such a fashion that the Corps knew that, absent maintenance, the banks would deteriorate and eventually cause erosion on Ritter's land. When asked during cross-examination if the Corps contemplated the extent of the erosion which had occurred, Thomas Gafford, the Corps' project engineer for the ROD, responded, "Did I contemplate? I not only contemplated, but in discussion it was not contemplated but absolutely predicted, assured that gully erosion would take place at various points." Record at 298, Ritter (No. J-C-85-215).
 
 
 37
 Gafford was also questioned about maintenance of the ROD. He admitted that the only maintenance done to the ROD was
 
 
 38
 a continuing inspection of all our work and seeing when it needs vegetative removal, killing the willows and getting them out to keep [the ROD] from choking up. And * * * where these laterals have come in and discharged silt out into the ditch, if sandbars form, then it's estimated that every so many years you're going to have to come back with small light equipment and take those sandbars out.
 
 
 39
 Record at 270. As the district court recognized, "maintenance" of the ROD, from the Corps' viewpoint, consisted of keeping the ditch functionable but in no way to prevent collapse of the walls.
 
 
 40
 The Corps had a responsibility of maintaining the ROD, as designed and constructed. It is uncontroverted that proper maintenance of the ROD would have prevented erosion. Lester McCorkle, a drainage contractor, testified that sodding, riprap, or drop-pipes would have prevented the erosion. Record at 65. Drop-pipes are more of a design feature, installed at the time of construction, and thus may not be considered at this point. Sodding and riprap, however, are maintenance options which could have been utilized to maintain the walls of the ROD at any point where erosion manifested itself.
 
 
 41
 Although the district court made no specific findings as to negligent maintenance, we affirm based on ample evidence in the record which clearly supports a finding of negligent maintenance. Furthermore, we cannot say that the district court was clearly erroneous in finding that the Corps' failure to operate the ROD correctly by way of adequate maintenance caused the erosion. See Fed.R.Civ.P. 52(a).
 
 
 42
 The government claims that the following language of the easement relieves any duty owed: "For the consideration aforesaid, grantor agrees to discharge, release and hold harmless the grantee and its assigns from any and all damages that may be occasioned by or result from the exercise of the rights, privileges and easements granted herein." The district court held that this language exempts the government from liability only for damage done within the easement area. A district court's opinion is entitled to substantial deference when it involves a question of state law. Benedictine Sisters v. St. Paul Fire & Marine Ins. Co., 815 F.2d 1209, 1211 (8th Cir.1987). We therefore give deference to the court's analysis.
 
 D. Damages
 1. Lost Income
 
 43
 The government disputes the $5600 damage award for lost income because that amount provides for loss of income for the years 1978 through 1985, even though the district court, in its findings, explicitly found that the erosion damage did not extend beyond the government's easement until 1982. We note, however, that in the portion of its opinion which specifically discusses annual loss of income, the district court did take into account the easement and accordingly adjusted Ritter's claim for annual loss from diminished rent.
 
 
 44
 An award of damages is a question of fact which will not be set aside unless clearly erroneous. See Fed.R.Civ.P. 52(a). As we have previously stated, "The law does not require mathematical precision in proof of a loss; proof to a reasonable certainty is sufficient." Lowe v. E.I. DuPont de Nemours & Co., 802 F.2d 310, 311 (8th Cir.1986). We cannot say as a matter of law that, based on the proof of annual loss presented by Ritter and the mitigating factors established by the Corps' evidence, the district court's award of damages for lost income was clearly erroneous. Therefore, we affirm this portion of the damage award.
 
 2. Diminution in Value
 
 45
 The government contends that the $20,000 damages awarded by the district court for decline in the fair market value of the land are unsupported by the evidence. Again, we cannot say that, based on the evidence, this amount was clearly erroneous under Rule 52(a).
 
 
 46
 The government also argues that the district court lacked jurisdiction to award damages for diminution in value because such an award would in actuality constitute damages for a permanent taking, and the FTCA does not provide the district court with jurisdiction over inverse condemnation claims. Under the Tucker Act, 28 U.S.C. Sec. 1346(a) (1982), district court jurisdiction over inverse condemnation claims is limited to $10,000 or less. Persons with claims of greater than $10,000 must proceed in the United States Claims Court.
 
 
 47
 At the outset, the district court properly severed any possible inverse condemnation claim based on the belief that the amount in controversy would exceed $10,000. The court then proceeded with its analysis under the FTCA. The government has argued that the FTCA does not provide jurisdiction for awarding compensation for land permanently taken. While this may be true, the FTCA does provide that the United States will be liable under circumstances where a private person would be liable. 28 U.S.C. Sec. 1346(b) (1982).
 
 
 48
 In general, the standard for measuring damages for the negligent destruction of, or completed injury to, a building or improvement on land which cannot be easily valued apart from the land is measured by diminution in value of the land as a whole. C. McCormick, Handbook on the Law of Damages Sec. 126, at 480 (1935). Logically, damages for negligent injury to the land itself must also be measured by diminution in value. See Bellaire v. Worcester Lumber Co., 177 Mich. 222, 230, 143 N.W. 63, 65-66 (1913) (holding that, where plaintiff's riparian land was flooded because of a negligent log jam causing injury to the farmland, the measure of damages was the amount of damage done to the farm as an entirety). Because the government must be accountable for its negligence to the same extent as a private person, we hold that the award of $20,000 for diminution in the value of Ritter's land was the appropriate measure of damages under the FTCA.
 
 3. Prevention of Further Injury
 
 49
 The government argues that the district court lacked jurisdiction to award the cost of curative measures because the court may not give injunctive relief under the FTCA. True, the FTCA provides only for money damages, not injunctive relief. But while the purpose of the $50,000 may be in the nature of a mandatory injunction in that it prevents further injury, the award itself is monetary in nature, as required by the FTCA.
 
 
 50
 Again, we must emphasize that the FTCA places liability upon the federal government as if it were a private entity, "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. Sec. 1346(b) (1982). The government asserts that, under Arkansas law, the general rule of damages is cost of repair, but when the cost of repair is disproportionate to the value of the land, then the value of the land will limit the amount of damages. Carter v. Quick, 263 Ark. 202, 563 S.W.2d 461, 465 (1978). This reliance on Arkansas law is misplaced and actually strengthens the validity of the district court's award. The cost of repair, to replace the lost topsoil, would be astronomical. Thus, the court must limit damages to the value of the land, which is at least $400,000. The damages awarded by the district court totalled $75,600, well within the value of the total acreage which eventually would be severely damaged by erosion.
 
 4. Mitigation of Damages
 
 51
 The government also claims that Ritter is not entitled to any damages due to its failure to mitigate. Arkansas comparative fault law denies recovery to a plaintiff who is over fifty percent at fault. Ark.Code Ann. Sec. 16-64-122 (1987). The district court found, however, that the government's evidence failed to prove that Ritter was at least fifty percent at fault. Based on the record, we cannot say that this finding is clearly erroneous. See Fed.R.Civ.P. 52(a).
 
 5. Cross-Appeal
 
 52
 Ritter's cross-appeal is also based on the award of $50,000 for curative measures. Ritter disputes the sufficiency of this portion of the damages, claiming that the "undisputed proof" of repair cost was $120,077.85.
 
 
 53
 A government witness testified that the proposed plan for stabilizing Ritter's land was not the most efficient, but he did not recommend an alternative method. Ritter contends that this testimony was insufficient rebuttal evidence.
 
 
 54
 Once again, we must rely on Rule 52(a) and affirm the good judgment of the trial judge. The award of $50,000 to pursue stabilization of erosion so as to prevent further damage to Ritter's land is not clearly erroneous.
 
 III. CONCLUSION
 
 55
 For the reasons stated above, the judgment of the district court against the government and the award of $75,600 to Ritter are affirmed.
 
 
 
 [1]
 The Honorable G. Thomas Eisele, Chief Judge, United States District Court for the Eastern District of Arkansas
 
 
 [2]
 A recent Sixth Circuit case, In re Ohio River Disaster Litigation, 862 F.2d 1237 (6th Cir.1988), supports our position that negligent maintenance is actionable. The Sixth Circuit held that the failure of the Corps to conduct periodic inspections of a dam pool and to replace a broken latch pin essential for use of the dam's lock system, as well as the Corps' failure to sufficiently train the lock personnel, were actions involving operational, non-policy decisions and thus not protected by the discretionary function exception. Id. at 1245-46
 
 
 [3]
 The general rule in Arkansas applicable to private parties in somewhat similar circumstances has been set forth as follows:
 "A landowner is liable for damages to his neighbor caused by his negligent failure to keep his premises in repair. * * * A landowner who is guilty of negligence in allowing matter, offensive or inoffensive of itself, such as water, dirt, sand, debris, and the like, to pass from his land into that of the adjoining proprietor, is liable for damage caused thereby, irrespective of motive or intent, but he is liable only for his negligence. The injured owner is not precluded from recovery because he has failed to erect barriers to protect himself from his neighbor's negligence. Failure of plaintiff to make a reasonable effort to minimize damages goes to the extent of a recovery and not to the right of recovery."
 Anderson Hotels of Louisiana, Inc. v. Seibert, 213 Ark. 624, 211 S.W.2d 876, 878 (1948) (citations omitted). The Arkansas Supreme Court has also explicitly held that "[o]ne who collects and keeps water on his premises, which is likely to do mischief if not properly controlled, is liable for his negligence, either in the original construction of his reservoir or receptacle [or] in subsequently allowing it to become defective * * *." Dye v. Burdick, 262 Ark. 124, 553 S.W.2d 833, 836 (1977) (quoting Anderson Hotels, 211 S.W.2d at 878).